UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
JERONIMO MARADIAGA, COSME DEL ROSARIO-
BELL, RANDOLPH CARR, and KEVIN PARK,

                            Plaintiffs,

      -against-

THE CITY OF NEW YORK, *a municipal entity*, NEW
YORK CITY DEPARTMENT POLICE OFFICER
KEVIN COX, *(Shield No. 3270), in his individual
capacity*, SERGEANT RAY THORNEY, *(Shield No.
3814), in his individual capacity*, et al.,

                            Defendants.
------------------------------------- x

MEMORANDUM DECISION
AND ORDER

16 Civ. 8325 (GBD)

GEORGE B. DANIELS, United States District Judge:

     Plaintiffs Jeronimo Maradiaga, Cosme Del Rosario-Bell, Randolph Carr, and Kevin Park bring this action under 42 U.S.C. § 1983 against the City of New York (the "City"), two New York City Police Department ("NYPD") sergeants, and a number of NYPD officers, known and unknown. Plaintiffs allege that Defendants violated their constitutional rights in connection with their arrest on February 22, 2014. (Second Am. Compl. ("SAC"), ECF No. 54.) Specifically, Plaintiffs' Second Amended Complaint includes claims for unreasonable seizure and false arrest, denial of the right to a fair trial, First Amendment retaliation, malicious abuse of process, violation of equal protection, failure to intervene, and municipal liability. (*Id.* 6–17.)

     Pending before this Court are the parties' cross-motions for summary judgment,[1] (ECF Nos. 113 and 121). In the course of briefing and oral argument on such motions, Plaintiffs

---

[1] Plaintiffs also filed a letter motion for leave to file sur-reply, (ECF No. 136), which this Court denied on September 30, 2020. Plaintiffs' proposed sur-reply contained arguments concerning whether (1) Plaintiffs are entitled to bring an excessive force claim and (2) Defendants are entitled to qualified immunity for the false arrest or right to a fair trial claims. This Court denied Plaintiffs' request, because Plaintiffs (1) were

voluntarily dismissed their claims for malicious abuse of process, equal protection violations, failure to intervene, and municipal liability. (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. Pursuant to Fed. R. Civ. P. 56 ("Defs. MSJ Mem."), ECF No. 114, at 4; Pls.' Mem. of Law in Opp'n to Def.'s Mot. for Partial Summ. J. and Cross-Mot. for Partial Summ. J. ("Pls. MSJ Mem."), ECF No. 122, at 30; Tr. of Oral Arg. dated July 29, 2020 ("OA Tr."), at 2–4.) Additionally, Plaintiffs withdrew claims against all Defendants other than the City, Sgt. Ray Thorney, and Officer Kevin Cox.[2] (Defs. MSJ Mem. at 4; OA Tr. at 3:6–17.)

Defendants' motion for summary judgment dismissing Plaintiffs' remaining claims (i.e., false arrest and unlawful seizure, denial of the right to a fair trial, and First Amendment retaliation) is GRANTED. Plaintiffs' motion for partial summary judgment in their favor on their claims for false arrest and denial of a fair trial is DENIED.

---

subsequently afforded the opportunity to submit papers on the first of these arguments and (2) provided no basis for why they could not have included arguments for the latter in their previous briefing.

[2] Plaintiffs, for the first time, seek to add an excessive force claim in their brief in opposition to Defendants' motion for summary judgment. (Pls. MSJ Mem. at 14.) Specifically, Plaintiffs allege that Sgt. Thorney "abruptly and without warning grabbed Mr. Maradiaga and slammed his face into chain-link fence running along the pedestrian walkway of the bridge." (*Id.*) The description of physical interactions between Defendants and Plaintiffs in the SAC is limited to the fact that "[i]ndividual plaintiffs were then handcuffed." (SAC ¶ 23.) It is "inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." *Wilson v. City of New York*, 480 Fed. Appx. 592, 594 (2d Cir. 2012). Plaintiffs argue that Defendants can show no prejudice because the circumstances of the arrest and Plaintiff Maradiaga's injuries were discussed in depositions. (OA Tr. at 10:4–12.) Leave to amend a complaint should be "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). A motion to amend may be denied, however, if there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Here, Plaintiffs had ample opportunity to seek leave to amend their claims prior to the summary judgment stage. The complaint has already been twice amended. Defendants would be prejudiced by adding a claim at this stage of litigation, when lengthy discovery has already concluded without it. Plaintiffs' motion to amend the SAC to add a claim of excessive force is denied.

2

## I. FACTUAL BACKGROUND

On February 22, 2014, at approximately 9:00 p.m., Officer Cox and Sgt. Thorney were, along with other officers, conducting a vehicle safety checkpoint at the end of the 145th Street Bridge, which connects the Bronx to Manhattan. (Pls.' Resp. to Defs. Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Rule 56.1 Counter-Statement"), ECF No. 124, ¶ 1.) The checkpoint took place on the Manhattan side of the bridge, near the intersection of Lenox Avenue and 145th Street. (*Id.* ¶ 3.) The purpose of the checkpoint was to ensure vehicle safety by inspecting things including, but not limited to, seat belts, vehicle equipment, and driver's licenses. (*Id.* ¶ 2.) Every third vehicle on the Manhattan bound side of the bridge was stopped and directed to pull over into a "chute" lane, which was the lane closest to the sidewalk. (*Id.* ¶¶ 5–6.) When a car pulled into the "chute" lane, officers approached the vehicle's driver's side while having their backs to ongoing traffic in the next lane to request a driver's license, insurance, and registration. (*Id.* ¶¶ 13–15).

Marked police vehicles with flashing turret lights were positioned on both ends of the checkpoint. (*Id.* ¶ 8.) One police vehicle was located at the rear where the checkpoint began. (*Id.* ¶ 9.) Two vehicles were located at the front, along with an additional vehicle that was a designated pursuit vehicle in case stopped vehicles attempted to flee. (*Id.* ¶¶ 10–11.) Additional safety precautions included flares at the beginning of the checkpoint, reflective high visibility traffic vests, and traffic cones. (*Id.* ¶¶ 7–8.) Sgt. Thorney was the checkpoint supervisor and Officer Cox's role was to approach and interact with vehicles stopped at the checkpoint. (*Id.* ¶ 15.)

At the same time, Plaintiffs were on "Cop Watch" patrol as part of a group called People's Justice that aims to hold police accountable for stop-and-frisk activities. (*Id.* ¶¶ 16–17.) The individuals on patrol were split into two teams, with all four Plaintiffs comprising the "front" team and working in tandem with a separate "back" team. (*Id.* ¶¶ 18–20.) Though Plaintiffs were not

3

restricted to individual roles, Maradiaga was responsible for handing out flyers to civilians, Del Rosario-Bell was responsible for communicating with the back team via radio, Carr was responsible for speaking for Plaintiffs during any interactions with police, and Park was responsible for filming police activity. (*Id.* ¶¶ 21–22.)

Plaintiffs approached the checkpoint from Lenox Avenue and walked onto the sidewalk of the 145th Street Bridge on the Manhattan bound side of traffic. (*Id.* ¶¶ 25, 27.) Park began filming the checkpoint. (*Id.* ¶ 26.) After passing the front police vehicle, Plaintiffs stopped as a group on the sidewalk approximately one to two car lengths from the front of the safety checkpoint and less than 5 feet from one of the stopped vehicles. (*Id.* ¶¶ 30–31, 34.) Plaintiffs were the only pedestrians standing still as a group on the sidewalk near the stopped vehicles. (*Id.* ¶ 35.) At this point, Officer Cox was walking from a stopped vehicle to the front police vehicle to run information provided by the vehicle. (*Id.* ¶ 36.) His attention was diverted from the safety checkpoint towards Plaintiffs, who he approached and asked to move approximately 5 to 10 feet back towards one of the front police vehicles. (*Id.* ¶¶ 41, 44–45.) From that location, Plaintiffs would be able to observe and record the safety checkpoint, but would not be parallel to vehicles stopped at the checkpoint. (*Id.* ¶ 46.) Officer Cox asked Plaintiffs three times to move to the front police vehicle, but instead of doing so, and despite Officer Cox explaining his safety concerns with their current location, Plaintiffs took only one step back per request and asserted their right to document police activity. (*Id.* ¶¶ 47, 50–57.) At no point did Officer Cox tell Plaintiffs that they could not film the checkpoint or ask Plaintiffs to leave the bridge or turn off the video camera. (*Id.* ¶¶ 44–55.)

Officer Cox returned to the vehicle he had been interacting with at the checkpoint and resumed his duties. (*Id.* ¶ 61.) Plaintiff Maradiaga then moved closer to the checkpoint by

4

approaching another stopped vehicle. (*Id.* ¶ 66.) He handed at least one flyer to the occupants of the stopped vehicle. (*Id.*) Sgt. Thorney, the checkpoint supervisor, observed Plaintiff Maradiaga hand an object to the occupants, but did not know what the object was or that Maradiaga was handing flyers. (*Id.* ¶ 67.) Sgt. Thorney and Officer Cox approached Plaintiffs and Sgt. Thorney directed them to move approximately 10 to 15 feet away, near a light pole beyond the traffic cones and the front end of the checkpoint. (*Id.* ¶ 70.) Plaintiffs would still be able to observe the safety checkpoint from that location, though the front police car blocked the view of the drivers' sides of the stopped vehicles where police were interacting with civilians. (*Id.* ¶ 72–73.) Sgt. Thorney told Plaintiffs they could film, but directed them to not interact with the stopped vehicles. (*Id.* ¶ 69.) During this interaction, Defendants told Plaintiffs at least 12 times to move back, and explained that Plaintiffs were creating a "dangerous situation" by their proximity to an active checkpoint. (*Id.* ¶¶ 69–96.) Plaintiffs did not move to the specified location and again took, at most, one step back in response to each direction to move back. (*Id.*) They responded by asserting their right to record police activity. (*Id.*) Plaintiffs were then arrested. (*Id.* ¶ 97.) The members of the back team, who had maintained a safe distance beyond what Officer Cox and Sgt. Thorney indicated to Plaintiffs, were also filming but were not arrested. (*Id.* ¶¶ 103–104.)

Plaintiffs Maradiaga and Del Rosario-Bell were charged with NY PL § 195.06 obstructing governmental administration ("OGA"), a misdemeanor, and ultimately received adjournments in contemplation of dismissal ("ACD"). (*Id.* ¶¶ 106–107.) Plaintiffs Carr and Park were issued summonses for NY PL § 240.20(6) disorderly conduct for failing to comply with an order to disperse, but the summonses were never submitted for prosecution, and they never appeared in court for arraignment in connection with the summonses. (*Id.* ¶¶ 108–110.)

5

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when "it 'might affect the outcome of the suit under the governing law.'" *Gayle*, 313 F.3d at 682 (quoting *Anderson*, 477 U.S. at 248).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact. To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, the opposing party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the opposing party and draw all inferences in that party's favor. *See Niagara*, 315 F.3d at 175. However, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016)

(internal citations omitted). Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286.

The standard for cross-motions for summary judgment is the same: a court will "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (quoting *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)).

### III. PLAINTIFFS' CLAIMS FOR FALSE ARREST AND UNLAWFUL SEIZURE FAIL

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause . . . is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted). Both claims require a showing that, *inter alia*, the defendant intentionally confined the plaintiff without consent or justification. *Pelayo v. Port Auth.*, 893 F. Supp. 2d 632, 639 (S.D.N.Y. 2012). Regardless of whether the action is brought under state law or Section 1983, the existence of probable cause to arrest constitutes sufficient justification and is thus a complete defense to liability. *Weyant*, 101 F.3d at 852 (citations omitted). If there is no arrest warrant, "the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010). "An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* (quoting *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006)). A Fourth Amendment claim fails "if there was probable cause to arrest Plaintiffs for any single offense," regardless of what crimes were charged. *Marcavage v. City of*

7

*New York*, 689 F.3d 98, 110 (2d Cir. 2012). Whether or not probable cause exists "may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852.

Here, Plaintiffs Maradiaga and Del Rosario-Bell were arrested for OGA[3] and Plaintiffs Carr and Park were arrested for disorderly conduct for failing to comply with an order to disperse.[4] There was sufficient probable cause to arrest Plaintiffs for both charges. Plaintiffs' presence created a security risk for officers conducting the vehicle checkpoint, and they did not comply with numerous directives to move to a safe distance. An ongoing traffic stop is "especially fraught with danger to police officers." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009). Officers conducting the checkpoint needed to display a heightened level of focus to observe the stopped occupants and vehicles, while also staying alert to the traffic passing directly behind them. By congregating mere feet from the stopped vehicles, Plaintiffs created a distraction for officers, or at the very least, presented an additional unknown factor to officers who were already trying to assess and minimize other potentially emergent safety concerns with the checkpoint. Moreover, Plaintiffs approached the checkpoint at night, when visibility was diminished. Plaintiffs' close proximity presented a safety risk and interfered with the officers' ability to conduct the vehicle checkpoint.

---

[3] "A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference." NY Penal Law § 195.05.

[4] "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e congregates with other persons in a public space and refuses to comply with a lawful order of the police to disperse." New York Penal Law § 240.20(6).

8

Plaintiffs disregarded at least 15 directives to move a reasonable distance away from the checkpoint.[5] "[A] person is guilty of committing disorderly conduct if he refuses to obey an officer's order to move, unless the order was 'purely arbitrary' and 'not calculated in any way to promote the public order.'" *Crenshaw v. City of Mount Vernon*, 372 Fed. Appx. 202, 206 (2d Cir. 2010) (quoting *People v. Galpern*, 181 N.E. 572, 574 (1932)). Officer Cox asked Plaintiffs to move to a location five to ten feet away where Plaintiffs could still observe and film the checkpoint. Sgt. Thorney asked Plaintiffs to move slightly further, to a location fifteen feet away from where they were located. Plainly, Defendants' orders were not purely arbitrary and were designed to bring order to a potentially dangerous situation. Plaintiffs' defiant actions thus presented sufficient probable cause for their arrest for both OGA and disorderly conduct. *See Marcavage*, 689 F.3d at 110 (probable cause to arrest for OGA existed where plaintiffs rejected 17 directives by three officers to leave a no-demonstration zone and instead asserted a constitutional right to demonstrate in that location); *Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 102 (S.D.N.Y. 2016) (probable cause to arrest for OGA and disorderly conduct existed after plaintiffs refused to obey officers' orders to disperse notwithstanding the assertion of a First Amendment right).

Plaintiffs argue that Defendants did not have probable cause to arrest them because the safety checkpoint itself was not authorized by law. Plaintiffs argue that the vehicle traffic checkpoint was unconstitutional because motorists were not provided "adequate notice" of its existence and no opportunity to avoid the checkpoint once they entered the bridge. (Pls.' MSJ

---

[5] Plaintiffs dispute whether these directives were "orders" and characterize them instead as "suggestions." "Although on summary judgment the evidence must be viewed in the light most favorable to Plaintiffs as the non-moving parties, when there is reliable objective evidence—such as a recording—the evidence may speak for itself." *Marcavage*, 689 F.3d at 110 (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)). Here, there is incontrovertible video evidence that Officer Cox and Sgt. Thorney were ordering the Plaintiffs to move to the indicated locations.

9

Mem. at 9–10.) But Defendants did have a number of protocols in place that would have alerted motorists to the checkpoint. Specifically, the safety checkpoint was delineated by flares at the beginning of the checkpoint, flashing turret lights from marked police vehicles on both ends of the checkpoint, traffic cones, and police officers walking in the street wearing high visibility traffic vests. (Rule 56.1 Counter-Statement ¶ 8.) Plaintiffs have submitted no evidence that indicates that motorists could not see these conspicuous items in advance of entering the bridge or were otherwise unaware that they were entering a vehicle checkpoint. Plaintiffs simply rely on speculation, which is axiomatically insufficient to create a material issue of fact and defeat a motion for summary judgment.

### IV. PLAINTIFFS' DENIAL OF THE RIGHT TO A FAIR TRIAL CLAIM FAILS

Plaintiffs allege that the charges brought against Plaintiffs Maradiaga and Del Rosario-Bell were based upon false statements of Officer Cox.[6] (SAC ¶ 31.) As a result, they allege Plaintiffs Maradiaga and Del Rosario-Bell were denied the right to a fair trial. The statements in question are found in Officer Cox's arrest reports and the criminal complaint sworn to by Officer Cox. Specifically, Plaintiffs identify three statements in the arrest reports that were identical for both Plaintiffs Maradiaga and Del Rosario-Bell: (1) "The defendant was disrupting the checkpoint by walking between vehicles," (2) "handing out flyers on the street," and (3) "Defendant was asked not to hand out material to motorists . . . Defendant continued to hand out flyers after a lawful order . . ." (Pls.' Reply to Mot. for Partial Summ. J., ECF No. 135, at 8.) Additionally, in the criminal complaint, Officer Cox stated, "I observed the [Plaintiffs] conversing with and handing flyers to drivers who I had pulled over. When I asked the [Plaintiffs] to stop interacting with the

---

[6] Though the SAC alleges that all of the charges were based on false statements by Officer Cox, Plaintiffs do not identify specific statements in the SAC and in their briefing, limit the purportedly false statements to those related to Plaintiffs Maradiaga and Del Rosario-Bell.

10

drives [*sic*] until the drivers completed the checkpoint for safety reasons, the [Plaintiffs] continued to speak to drivers and hand them flyers." (*Id.* at 9–10.)

A claim for denial of the right to a fair trial based on fabricated evidence is derived from the Sixth Amendment and the Due Process Clauses of the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution. *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 628 (E.D.N.Y. 2017). To establish a fabricated evidence claim, a plaintiff must show that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). Notwithstanding this framework, Defendants argue that Plaintiffs' claim is barred in light of the Supreme Court's recent decision in *McDonough v. Smith*, 139 S. Ct. 2149 (2019).

In *McDonough*, the Supreme Court held that a plaintiff "[can]not bring his fabricated-evidence claim under § 1983 prior to favorable termination of his prosecution." *Id.* at 2156. The Court made this determination in the context of an analysis of when such a § 1983 claim accrues for limitations purposes. *Id.* at 2155. In arriving at its conclusion, the Court looked to the analogous common-law tort of malicious prosecution, which "accrues only once the underlying criminal proceedings have been resolved in the plaintiff's favor." *Id.* at 2156. The Court explained that "[a]t bottom, both claims challenge the integrity of criminal prosecutions undertaken 'pursuant to legal process.'" *Id.* at 2156 (citing *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)). Further, "malicious prosecution's favorable-termination requirement is rooted in pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *Id.* at 2157. The Court reasoned that because civil claims

11

"asserting that fabricated evidence was used to pursue a criminal judgment" implicate similar concerns for finality and consistency, "it makes sense to adopt the same rule." *Id.* Importantly, though, the Court left open the scope of what constitutes a favorable termination, finding that the plaintiff's acquittal in *McDonough* meant that this broader question could be reserved for another court's consideration. *Id.* at 2161 n.10 ("Because McDonough's acquittal was unquestionably a favorable termination, we have no occasion to address the broader range of ways a criminal prosecution (as opposed to a conviction) might end favorably to the accused.").

Here, Plaintiffs Maradiaga and Del Rosario-Bell's charges were resolved by ACD. The Second Circuit has yet to consider whether an ACD qualifies as a favorable termination for purposes of a fabrication of evidence claim. This Court, however, takes its cues from the Supreme Court and analogizes Plaintiffs' claims to those for malicious prosecution in order to resolve this question. *See Gondola v. City of New York*, No. 16 Civ. 369 (AMD) (SJB), 2020 WL 1433874, at *5 (E.D.N.Y. Mar. 24, 2020) (relying on *McDonough's* reasoning for the finding that there are no "meaningful grounds for employing different definitions of favorable termination depending on whether the claim is for malicious prosecution or fair trial"). It is well established in the Second Circuit that an ACD is not a favorable termination in the context of a malicious prosecution claim. *Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002); *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980).

The majority of courts to have considered this question in the Southern and Eastern districts have ruled that an ACD is not a favorable termination for a fair trial claim. *See, e.g., Corso v. Calle-Palomeque*, No. 17 Civ. 6096 (NRB), 2020 WL 2731969 (S.D.N.Y. May 26, 2020); *Daniels v. Taylor*, 443 F. Supp. 3d 471 (S.D.N.Y. 2020); *Miller v. Terrillion*, 436 F. Supp. 3d 598 (E.D.N.Y. 2020); *but see Ross v. City of New York*, No. 17 Civ. 3505 (PKC) (SMG), 2019 WL 4805147 (E.D.N.Y. Sept. 30, 2019). An ACD is provided to both the innocent and the guilty. "[W]here, as

12

here, a criminal defendant has traded resolution of his culpability for peace, he may not bring a fair trial claim, the success of which would necessarily undermine the validity of a prosecution settled only by his acceptance of an ACD." *Miller*, 436 F. Supp. 3d at 606 (E.D.N.Y. 2020) (citations omitted).

Plaintiffs Maradiaga and Del Rosario-Bell challenge the basis of the proceedings brought against them, alleging that Officer Cox's arrest reports and sworn criminal complaint are comprised of false statements. *See Corso*, 2020 WL 2731969, at *7 ("[B]ecause Corso's fair trial claim challenges the very evidence that supported the initiation of criminal proceedings against him, . . . Corso's fair trial claim, like the fair trial claim brought by the plaintiff in *McDonough*, "challenge[s] the integrity of [his] criminal prosecution[ ]." (quoting *McDonough*, 139 S. Ct. at 2156)). Accordingly, their decision to terminate these proceedings by ACD requires dismissal of their claims of fabricated evidence.

## V.  PLAINTIFFS' FIRST AMENDMENT RETALIATION CLAIM FAILS

Plaintiffs allege that they were arrested in retaliation for exercising their First Amendment rights to "inform civilians of their rights" and "document[] the individual defendant's activities." (SAC ¶ 23.) To succeed on a First Amendment retaliation claim, a plaintiff must demonstrate that "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. City of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). The existence of probable cause generally defeats a retaliatory arrest claim, but as the Supreme Court has explained, "a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019). "In such cases, an unyielding requirement to show the absence of probable cause

could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.'" *Id.* (quoting *Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1953 (2018)).

In this case, probable cause existed to arrest Plaintiffs and they have not presented "objective evidence that [they were] arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech ha[ve] not been." *Id.* That is, Plaintiffs have not demonstrated that other individuals who were not filming or handing out flyers, but were within feet of vehicles stopped at a checkpoint and who refused to comply with police orders to move a reasonable distance away, were not arrested.

Plaintiffs present no evidence that Defendants' actions were motivated or substantially caused by their exercise of their First Amendment rights. It is undisputed that both Officer Cox and Sgt. Thorney told Plaintiffs they were welcome to film the checkpoint, though at a safe distance. (Rule 56.1 Counter-Statement ¶¶ 47, 51, 53, 69, 78). Further, the "back" team was also filming the checkpoint. Those two individuals, however, were not arrested. (*Id.* ¶ 104.)

## VI. CONCLUSION

Plaintiffs' motion for partial summary judgment, (ECF No. 121), is DENIED.

Defendants' motion for summary judgment dismissing Plaintiffs' claims, (ECF No. 113), is GRANTED.

The Clerk of Court is directed to close these motions accordingly.

Dated: New York, New York
      October 1, 2020

SO ORDERED.

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge